**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ESTATE OF MICHELE ROBEY,** | ) | |
| **Deceased, by Anastasia Robey, Administrator,** | ) | |
| | ) | **No. 17 CV 2378** |
| **Plaintiff,** | ) | |
| | ) | **Honorable Edmond E. Chang** |
| | ) | |
| **vs.** | ) | **Jury Demand** |
| | ) | |
| **CITY OF CHICAGO, Chicago Police Officers** | ) | |
| **STEPHEN ROMANSKI, Star #18685; and,** | ) | |
| **ANGELA STORCE, Star #9761;** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

i

# TABLE OF CONTENTS

Table of Contents…………………………………………………………………...............ii

Table of Authorities…………………………………………………………………………iii

Standard of Review………………………………………………………………….....…2

Summary of Facts …………………………………………………………………….………..3

**Argument**

    1.    **Plaintiff's §1983 Excessive Force Claims Against the Individual Defendants Must Be Decided By a Jury**……………….…..…………..………........................5

        A.  There is No Evidence that Defendant Romanski Acted in Defense of others…………………..………....……...................................................9

        B.  Defendant Storce is Liable for Excessive Force and Failure to Intervene…………..……….......................................................................10

        C.  Defendant Officers Are Not Protected by Qualified Immunity…………..…………..............................................................12

    2.    **Plaintiff's Claims Against The City Must Be Decided By a Jury**……………………………………………………………14

        A.  Plaintiff's *Monell* Policy Claims Must be Decided by a Jury……………14

        B.  Plaintiff's ADA Claims Must be Decided by a Jury……………………...21

    3.    **Plaintiff's State Law Claims Must Be Decided by a Jury**…………..………..29

        A.  The Fatal Shooting of Michele Robey Constituted a Wrongful Death, Battery, Intentional Infliction of Emotional Distress, and Conspiracy…...30

        B.  Defendants are not Protected by Immunity as a Jury Must Determine Whether their conduct was Willful and Wanton…………………………32

**Conclusion**……………………………………………………………………………34

Certificate of Service…………………………………………………………………35

# TABLE OF AUTHORITIES

## CASES

*Alto v. City of Chicago*, 863 F. Supp. 658 (N.D. Ill. Aug. 29, 1994) ........................... 32

*Anderson v. City of Atlanta*, 778 F.2d 678 (11th Cir. 1985)......................................... 20

*Askew v. City of Chicago*, 440 F.3d 894 (7th Cir. 2006) ................................................ 2

*Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) ...................................................... 10

*Bakes v. St. Alexius Medical Ctr.*, 955 N.E.2d 78 (1st Dist. 2011)................................ 30

*Barrett v. Orange County Human Rights Com'n*, 194 F.3d 341 (2nd Cir. 1999) ......................... 20

*Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004)................................................ 20

*Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954 (E.D. Wi. 2003) ......................................... 8

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)................................................................... 10, 11

*Cal. v. Hodari D.*, 499 U.S. 621 (1991)............................................................................ 10

*Cameron v. Francis Slocum Bank and Trust Co.*, 824 F.2d 570 (7th Cir. 1987) ......................... 2

*Chew v. Gates*, 27 F.3d 1432 (9th Cir.1994) ....................................................................... 20

*City of Canton v. Harris*, 489 U.S. 378 (1989)................................................................... 16, 17

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986)........................................................... 19

*Collier v. Budd Company*, 66 F.3d 886 (7th Cir. 1995)....................................................... 2

*Corgan v. Muehling*, 143 Ill. 2d 296 (1991) ...................................................................... 31

*Courtney v. Biosound*, 42 F.3d 414 (7th Cir 1994)............................................................. 2

*Crawford-El v. Britton*, 523 U.S. 574 (1998) .................................................................... 12

*Diaz v Salazar*, 924 F. Supp. 1088 (D.N.M. 1996)............................................................ 17

*Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498 (1994) ...................................... 30

*Doxie v. City of Harvey*, 1995 WL. 247989 (N.D. Ill. 1995) ........................................ 6

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) ........................................................ 22

*Estate of Keys by and through Doxie v. City of Harvey,* 1995 WL 247989 (N.D. Ill. 1995)........7

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002)........................................................................ 20

*Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985)....................................................... 20

*Gilbert v. City of Chicago*, 2019 WL. 4059047 (N.D. Ill. Aug. 28, 2019).................................. 8

*Graham v. Connor*, 490 U.S. 386 (1989), cited by Defendants at Dkt. 111............................ 5, 13

*Hainze. In Earl v. Espejo*, 2017 U.S. Dist. LEXIS 137398 (N.D. Ill. Aug. 28, 2017) ................ 27

*Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000)..................................................................... 26

*Estate of Hollstein v. City of Zion*, 2019 WL. 1619976 (Apr. 16, 2019, N.D. Ill.) ..................... 29

*Estate of Hollstein v. City of Zion*, 2019 WL. 1619976 (N.D. Ill., Apr 16, 2019) ........................ 9

*Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992) .................................................................... 19

*Horton v. City of Chicago*, 2018 U.S. Dist. LEXIS 168878 (N.D. Ill., Sept. 30, 2018).............. 32

*Horton v. Probjecky*, 883 F.3d 941 (7th Cir. 2018)........................................................ 13, 15, 16

*Jenkins v. Keating*, 147 F.3d 577 (7th Cir. 1998) ...................................................................... 10

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018)........................................................................ 6, 12, 13

*Knierim v. Izzo*, 22 Ill. 2d 73 (1961) ......................................................................................... 31

*Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1 (1992)..................................................... 30

*Lacy v. Cook Cnty.*, 897 F.3d 847 (7th Cir. 2018)..................................................................... 22

*Love v. Westville Correctional Ctr.*, 103 F.3d 558 (7th Cir. 1996) ............................................. 21

*Mangino v. McKenney*, 873 F.3d 75 (1st Cir. 2017) cert. den...................................................... 6

*McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992)................................................................. 10

*McGrath v. Fahey*, 126 Ill. 2d 78 (1988) ................................................................................... 30

*Medina v. Chicago*, 238 Ill. App. 3d 385 (1st Dist. Nov. 18, 1992)........................................... 32

*Murphy v. Martin Oil Co.*, 56 Ill. 2d 423, 308 N.E.2d 583 (1974)................................................ 30

*Newcomb v. City of Troy*, 719 F. Supp. 1408 (E.D. Mich. 1989)................................................ 21

*Notably, in Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018) ................................ 27

*Owen v. City of Independence*, 445 U.S. 622, 100 S. Ct. 1398 (1980)........................................ 20

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003)........................................................................ 2

*Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994)....................................................................... 8

*Poole v. City of Rolling Meadows*, 167 Ill. 2d 41 (Ill. 1995)....................................................... 32

*Porter v. City of Muncie*, 2000 WL. 682660 (S.D. Ind. February 16, 2000)................................ 8

*Rivas v. Freeman*, 940 F.2d 1491 (11th Cir. 1991) ................................................................ 20

*Russo v. Cincinnati*, 953 F.2d 1036 (6th Cir. 1992) ............................................................ 8, 17

*Spell v. McDaniel*, 824 F.3d 1380 (4th Cir. 1987)................................................................... 18

*Spencer v. Dawson*, 2006 U.S. Dist. LEXIS 81743 (N.D. Ill. Nov. 7, 2006)............................... 27

*Swofford v. Eslinger*, 686 F. Supp. 2d 1277 (M.D. Fla 2009) .................................................. 18

*Tennessee v. Garner*, 471 U.S. 1 (1985)................................................................................. 6

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010) ........................................................... 19

*Tucker v. County of Riverside*, 2018 WL. 6017036 (C.D. Calif. May 23, 2018) ........................... 8

*Warren v. Lincoln*, 816 F.2d 1254 (8th Cir 1987) ................................................................... 17

*Washington v. Ind. High Sch. Ath. Association*, 181 F.3d 840 (7th Cir. 1999) ............... 23, 24, 25

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) ....................................................... 26

*Weinman v. McClone*, 787 F.3d 444 (7th Cir. 2015)................................................................. 6

*Estate of Wells v. Bureau County*, 723 F. Supp. 2d 1061 (C.D. Ill. 2010) .................................. 20

*Williams v. Manchester*, 228 Ill. 2d 404, 320 Ill. Dec. 784, 888 N.E.2d 1 (2008) ...................... 30

*Wilson v. Town of Mendon*, 294 F.3d 1 (1st Cir. 2002)............................................................. 21

*Wis. Community Services v. City of Milwaukee*, 465 F.3d 737 (7th Cir. 2006)...................... 22, 26

*Wyatt v. Cole*, 504 U.S. 158 (1992) ............................................................................................ 12

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994) ............................................................................. 11

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) .................................................................................. 12

## STATUTES

42 U.S.C. § 12132 .......................................................................................................................... 21

42 U.S.C. §1983 ....................................................................................................................... 10, 12

720 ILCS 5/24-1(c) ........................................................................................................................ 3

740 ILCS 180/1 (2019) ................................................................................................................. 30

745 ILCS 10/1-101, et seq .......................................................................................................... 31

Illinois Criminal Code. See e.g., §§ 720 ILCS 5/33A-1(c) .......................................................... 3

Survival Act [755 ILCS 5/27-6 (2019)] ...................................................................................... 30

## OTHER AUTHORITIES

A. Miller & M. Kane, Federal Practice and Procedure ' 2726, at 115 16 (2d ed. 1983)..................2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ESTATE OF MICHELE ROBEY,** | ) | |
| **Deceased, by Anastasia Robey, Administrator,** | ) | |
| | ) | **No. 17 CV 2378** |
| **Plaintiff,** | ) | |
| | ) | **Honorable Edmond E. Chang** |
| | ) | |
| **vs.** | ) | **Jury Demand** |
| | ) | |
| **CITY OF CHICAGO, Chicago Police Officers** | ) | |
| **STEPHEN ROMANSKI, Star #18685; and,** | ) | |
| **ANGELA STORCE, Star #9761;** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

Michele Robey was shot and killed when Defendant Chicago Police Officers Stephen Romanski and Angela Storce discharged their weapons at her during rush hour in a busy Northside intersection while she was in the throes of a mental health crisis. Plaintiff alleges in her complaint that this use of deadly force was unconstitutionally applied by the police defendants, in violation of the 4th and 14th Amendments of the U.S. Constitution, that Defendant City of Chicago, through its police department, violated the Americans with Disabilities Act and that the City's policies and practices concerning training its police officers in how to properly respond to persons in mental health crisis were also a moving force in Ms. Robey's death. Additionally, Plaintiff asserts several pendant state law claims.

1

## STANDARD OF REVIEW

Citing to only a portion of the applicable summary judgment standard, the Defendants ask the Court to do what it may not do on summary judgment — view the evidence in the light most favorable to them and to make credibility judgments.

> On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, 'the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.' Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' We must look therefore at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true.

*Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

If the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial. *Cameron v. Francis Slocum Bank and Trust Co.*, 824 F.2d 570, 575 (7th Cir. 1987), citing 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2726, at 115-16 (2d ed. 1983); see also *Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006) ("If these subjects [as to which the plaintiff claimed inconsistencies existed] were material, then there would be work for the jury to do.").

If an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate. See Notes of the Advisory Committee to Rule 56 (e) 1963 Amendment. If the non-moving party offers specific evidence from which the finder of fact may reasonably infer that the testimony of a defendant does not represent the truth, the case then turns on the credibility of the witnesses and

this credibility judgment is best left to the finder of fact. *Collier v. Budd Company*, 66 F.3d 886, 893 (7th Cir. 1995); *Courtney v. Biosound*, 42 F.3d 414, 423-24 (7th Cir 1994).

## SUMMARY OF FACTS

The evidence relevant to the defendants, when viewed in the light most favorable to the Plaintiff, is as follows:

Defendant officers had no information that Michele Robey had caused any injury or property damage when they initially approached her while she was calmly sitting on a bench. PLT FACTS ##13, 15, 16, 17, 19. They only knew she possessed a knife but did not know if this kitchen knife, with a broken tip, even qualified as a dangerous weapon pursuant to the Illinois Criminal Code. See e.g., §§ 720 ILCS 5/33A-1(c) ["knife with a blade of at least 3 inches in length"); 720 ILCS 5/24-1(c) ["switchblade or ballistic knife"](2019). PLT FACTS ##13, 15, 17, 18, 23; Def. Fact 21. Defendant officers, well equipped and physically fit, made no inquiries of the 55 year old, slightly built Ms. Robey or of any witness as to her previous actions, if any, with the knife, nor did they inquire of the witnesses about Ms. Robey's mental state. PLT FACTS ##1, 2, 3, 6, 7, 15, 85. If they had, they would have learned that Michele was clearly in the throes of a mental health crisis, as was demonstrated by her words and actions in the CVS and outside as well as her wearing of numerous layers of clothing. PLT FACTS ## 8, 10, 11, 32, 82, 84. They would have learned that an untrained female civilian grabbed Ms. Robey's wrist that held the knife without being physically harmed. PLT FACTS #12. Instead of inquiring, Defendants Romanski and Storce initiated the encounter by approaching Ms. Robey from the back and side, and without any inquiry or even offering an introduction, by immediately yelling startling and repetitive commands at her, although it appeared Ms. Robey could not hear the commands. FACTS ##13, 20, 22, 24, VIDEO, Def. Ex F-3.

3

Within 30 seconds thereafter, Ms. Robey was fatally shot. VIDEO, Def. Ex F-3. During that time period, Defendant Romanski spent five seconds on his radio, but did not call for back up or a Crisis Intervention Team (CIT) officer. PLT FACTS ##44, 45. Defendant Romanski knew Ms. Robey was suicidal. PLT FACTS #30. Neither Defendant provided Ms. Robey with any warning that they intended to fire their weapons prior to shooting her. PLT FACTS #36. The distance between Ms. Robey and the officers when she was shot is disputed; the wound to Ms. Robey does not indicate a close range firing and witnesses estimate the distance to be up to 10 feet. PLT FACTS ## 34, 49; PLT DISPUTES #75. The positioning and movement of Ms. Robey and the officers is also disputed, with witnesses testifying she was backing away, moving side to side, and the bullet wound did not indicate a straight on firing. PLT FACTS #32, 33, 50; PLT DISPUTES #74.

The ultimate material fact of whether the Defendants were in imminent threat of death or great bodily harm is also disputed, *inter alia* by the fact that an unarmed civilian named Monica Bailey had grabbed Ms. Robey's wrist while she was waving the knife in the CVS and was not injured in that encounter. PLT FACTS #12, 42. Both defendants were physically fit, were wearing protective vests, were equipped with firearms, a Taser, OC spray and a police baton, and were familiar with de-escalation techniques, yet at no time did they attempt to disarm Michelle or attempt to de-escalate the encounter. PLT FACTS ##1, 2, 6, 7, 26, 27, 31, 33. 86-91.At the time Michele Robey was shot, she was not threatening any civilian and had turned back toward the defendant officers who were charging towards her. PLT FACTS #33. Ms. Robey was diagnosed with a schizoaffective disorder, had been recently subjected to a psychiatric hospitalization and, therefore, was a qualified person with a mental health disability and was entitled to be free from discrimination. PLT FACTS #5.

Neither Defendant officer had attended a two day Force Mitigation course that included identifying persons in mental health crisis as well as employing de-escalation strategies. PLT FACTS ##70, 71. Neither defendant officer received Crisis Intervention Training (CIT) and had never requested a CIT trained officer before the night of this incident. PLT FACTS ##59-61. In the 13 years prior to Ms. Robey's unjustifiable shooting, the Chicago police department had trained only approximately 10% of its street forces in CIT tactics, although the City's own 30(b)(6) witness testified adequate coverage would require 25% of the force to be trained. PLT FACTS ## 52, 53. The CPD's communications network had completely inadequate training and practices in how to determine whether the subject of a call for service involved a person in mental health crisis or how to respond if it were determined that this was the case. PLT FACTS ##53, 59-62, 77(d). The report by the Police Accountability Task Force (PATF), issued in 2016, and mandated by Chicago's mayor, along with the Department of Justice Report, released in January of 2017, found that the CPD's training with regard to responding to persons in mental health crisis was inadequate, and this was confirmed by provisions of the Consent Decree; thereby put the City on notice of these gross inadequacies. PLT FACTS ##77-79.

## ARGUMENT

Taking the facts and inferences in the light most favorable to the Plaintiff, only a jury can determine the federal and state claims against the Defendants.

## I.     PLAINTIFF'S §1983 EXCESSIVE FORCE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DECIDED BY A JURY

The actions of both Defendant officers in acting jointly to fatally shoot Michele Robey, when viewed in the context of the totality of the circumstances, as required by the U.S. Supreme Court in *Graham v. Connor,* 490 U.S. 386, 396 (1989), cited by Defendants at Dkt. 111, p. 5, were objectively unreasonable in violation of the Fourth Amendment. In *Graham*, the Supreme

Court held that to determine the objective reasonableness of a particular seizure "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396. Here, the Defendants possessed no knowledge of the severity of the crimes which Ms. Robey had allegedly committed in a CVS pharmacy prior to their arriving on the scene. She did not pose an immediate threat to any civilian and any threat she posed to the officers was provoked by them, not immediate, and would not have caused them death or great bodily harm. She was not actively resisting arrest or attempting to flee at the time she was fatally shot.

It does not matter for purposes of the Fourth Amendment whether the Defendant officer subjectively believed that his or her life was in danger. *Weinman v. McClone,* 787 F. 3d 444, 449 (7th Cir. 2015) (Defendant officer's actions in fatally shooting man were objectively unreasonable and not protected by qualified immunity even though officer perceived a shotgun in the man's hands was pointed in his direction.) The Supreme Court has also held that a warning should be given, whenever feasible, prior to the use of deadly force. *Tennessee v. Garner,* 471 U.S. 1, 11-12 (1985). It is undisputed that no warnings were given to Ms. Robey.

A police officer's use of deadly force is an extreme action that is only reasonable (and therefore constitutional) when a suspect poses an immediate threat to police officers or civilians. *Mangino v. McKenney,* 873 F. 3d 75, 81 (1st Cir. 2017) *cert. den.* 138 S. Ct. 1311 (2018). Moreover, a "special solicitude" may be afforded to suicidal individuals in lethal force cases. *Mangino* at 82, citing *inter alia, Weinman v. McClone,* 787 F. 3d 444, 450 (7th Cir. 2015).

In a case with many similarities to the instant case, a district court denied summary judgment to a Harvey police officer who fatally shot a 42-year-old woman who refused commands to drop her weapon and then rushed at the officer with a 6 to 8 inch kitchen knife.

6

*Estate of Keys by and through Doxie v. City of Harvey,* 1995 WL 247989 (N.D. Ill. 1995). In *Keys*, the officers came to the decedent's trailer because there was a psychiatric evaluation order and she was threatening neighbors. The district court found that the officer was not at substantial risk of harm until the decedent waving the knife was within striking distance and noted the difference in relative size and fitness of the decedent compared to the shooting officer. The defendant did not shoot until the decedent was within one to two feet and the encounter lasted six minutes. The court in *Keys* determined that genuine issues of material fact therefore existed regarding whether excessive force was used, plaintiff's state and federal claims were allowed to proceed and defendant's motion for summary judgment was denied.

In the instant case, it is disputed how far Defendant Romanski was from Michele Robey when he fired, (between 5 to 10 feet) but even if the distance was five feet, that was not striking distance and all Defendant Romanski needed to do to avoid being within striking distance was to take a step backward, as he and Defendant Storce had previously done. Ms. Robey was of short stature and encumbered with multiple layers of clothing as well as holding a cup of coffee in one hand with the knife in her other hand. Defendant Romanski was almost 6 foot tall and physically fit. He was wearing a protective vest and the kitchen knife with a broken tip was no match. Initially, after he first saw the knife, he put away his firearm, indicating he did not consider the weapon a serious threat. The timing of the entire encounter was no more than 37 seconds. Moreover, the two officers outnumbered Ms. Robey and could have positioned themselves for their own protection, using the cover and shields of the structures at the intersection, and assisted each other in taking her into custody without using deadly force. Defendant Romanski took the time to use his radio for five seconds but failed to request back up or a CIT officer. The officers'

7

use of deadly force in a busy urban intersection during rush hour put innocent bystanders at more risk than did a mentally disturbed Michele Robey holding her kitchen knife.

Other courts have also denied summary judgment to police officers in shootings of individuals struggling with mental health issues who were armed with knives. See e.g., *Buchanan v. City of Milwaukee,* 290 F. Supp. 2d 954 (E.D. Wi. 2003) (Police who shot 33-year-old man with history of mental illness holding a butcher knife not entitled to summary judgment); *Porter v. City of Muncie*, 2000 WL 682660 (S.D. Ind. February 16, 2000) (Police officer not entitled to summary judgment when he fatally shot mentally disturbed woman who refused his commands to drop two large knives); *Russo v. Cincinnati,* 953 F. 2d 1036, 1045 (6th Cir. 1992) (Summary judgment denied when police officers fatally shot a mentally disturbed man armed "only with knives"); *Tucker v. County of Riverside,* 2018 WL 6017036 (C.D. Calif. May 23, 2018) (Summary judgment denied to police officers who fatally shot suicidal man who lunged at them after refusing commands to drop a large hunting knife).

Defendants claim the instant case is similar to the facts set forth in *Gilbert v. City of Chicago,* 2019 WL 4059047 (N.D. Ill. Aug. 28, 2019) but there are a number of important and controlling distinctions. In *Gilbert*, Judge Leinenweber granted summary judgment to the defendant officer who fatally shot a suicidal man armed with a knife. However, the decedent in *Gilbert* had lunged on top of the officer before the officer even exited his squad car and actually stabbed the officer in the chest, then climbed back on top of the officer and stabbed him three more times. The officer called for backup and it was only after the decedent began advancing again that he was shot. It was undisputed that the decedent repeatedly stabbed the officer. In contrast, Michele Robey never had any physical contact with either officer.

Similarly, in two other cases cited by the Defendants, the decedents actually had physical contact with the officers before the fatal shooting. Michele Robey never touched either officer and the officer knew of no one who had been physically harmed by her. In *Plakas v. Drinski,* 19 F. 3d 1143 (7th Cir. 1994), the decedent had struck an officer with a fireplace poker, requiring the officer to seek medical attention, had fled custody and was shot when he charged at an officer with the poker cocked over his head and the officer's ability to back away was involuntarily stopped. The officer fired when the decedent was two arm lengths away. In contrast, Michele Robey was not close enough to either officer to harm them prior to the time of the fatal shooting and she never struck them, caused any injury or made any physical contact.

Additionally, in this Court's recent decision in *Estate of Hollstein v. City of Zion,* 2019 WL 1619976 (N.D. Ill., Apr 16, 2019), the decedent was an active resister who had been Tased and pepper-sprayed but continued to physically fight with the officers and finally placed his hand on the officer's gun holster causing the officer to reasonably believe that the decedent was trying to grab his gun. The continuing physical struggle resulted in the two officers and the decedent falling to the ground, at which time it was undisputed that the decedent's hand was on the holster of the officer's firearm. This court did not reach any conclusion with regard to whether or not the fatal shooting was objectively unreasonable, but rather held that the defendants were entitled to qualified immunity. [See argument below]

### A. There is No Evidence that Defendant Romanski Acted in Defense of Others

At the time of the fatal shooting there was no one who was in any zone of danger from Michele Robey and the knife she was periodically waving. Ms. Robey was not attempting to flee at the time she was fatally shot; she had in fact turned around and was heading away from the northbound Western Avenue bus. As can be clearly seen in the video and as testified to by

numerous passersby, the two officers and Ms. Robey were the only individuals within the area of the southwest corner of the intersection. Given this evidence, Defendant Romanski cannot claim his use of deadly force was objectively reasonable to prevent death or great bodily harm to anyone else.

### B. Defendant Storce is Liable for Excessive Force and Failure to Intervene

Defendant Storce pointed her firearm at Michele Robey's back and discharged her weapon from a distance of 5 to 10 feet intending to strike Ms. Robey's body. PLT FACTS #38, 39. She did not attempt to calm the situation at any point, she refused to grab ahold of Ms. Robey to maintain Ms. Robey's distance from Defendant Romanski, refused to provide a warning prior to firing and refused to verbally intervene to prevent Defendant Romanski from firing. Defendant Storce was therefore personally involved in this 37 second encounter which lead to Ms. Robey's death.

42 U.S.C. §1983 creates a cause of action based upon personal liability and an individual will be liable when he or she causes or participates in a constitutional deprivation. *Jenkins v. Keating,* 147 F. 3d 577, 583 (7th Cir. 1998) (cited by Defendants, Dkt. 111, p. 12). Defendant Storce clearly participated in this constitutional violation and should not be exonerated because she missed her target. Justices Stevens and Marshall have specifically cautioned that such a conclusion is absurd and "profoundly unwise." *Cal. v. Hodari D.,* 499 U.S. 621, 630 (1991) (Stevens and Marshall, JJ, *dissenting*). Moreover, Defendant Storce had her weapon drawn and pointed at Ms. Robey from the time the Defendant officers initially approached her on the bench. Ms. Robey was clearly disturbed and had not committed injury to anyone. An officer pointing a weapon at an individual can be excessive force in violation of the Constitution. *Baird v. Renbarger,* 576 F. 3d 340, 346 (7th Cir. 2009); *McDonald v. Haskins,* 966 F. 2d 292, 245 (7th

Cir. 1992).[1]

Moreover, even bystander officers who witness fellow officers--whether supervisory or nonsupervisory--commit a constitutional violation and who do not avail themselves of the opportunity to intervene and stop the violation cannot avoid liability. *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972). In *Brishke,* the Seventh Circuit held that police officers could be held liable under §1983 even if they did not personally participate in the violation of plaintiff's civil rights by beating him because they failed to protect the plaintiff from others who did violate his rights by beating him in their presence. 466 F.2d at 10.

The *Brishke* opinion was followed in *Yang v. Hardin*, 37 F.3d 282, 284-85 (7th Cir. 1994), where a police officer who stood by as a fellow officer committed a constitutional tort was held liable for his own failure to intervene on the plaintiff's behalf. The court in *Yang* set forth the following requirements to establish liability, making it clear that the theory applies broadly, not just where excessive force is alleged:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under §1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

37 F.3d at 285.

Fatally shooting Michele Robey constituted the unconstitutional use of deadly force. Defendant Storce at all times was present and participating in the encounter and clearly had an opportunity to intervene to prevent the death of Ms. Robey. Defendant Storce made no attempt to

---

[1] In fact, the Consent Decree in *State of Illinois v. City of Chicago,* No. 17-c-6260 (N. D. Ill) requires officers to report whenever they point their weapon at a civilian. PLT FACTS #79 (c).

calm or de-escalate the situation, failed to position herself to contain Ms. Robey and did nothing to attempt to avoid or even discourage her partner from firing the fatal shot. Hence, when the evidence against her is viewed in the light most favorable to the Plaintiff, she too can be held liable under §1983.

### C.     Defendant Officers Are Not Protected by Qualified Immunity

The court imposed doctrine of qualified immunity has come under increased attack as it has become more and more obvious that it is an unfair and over utilized weapon in the hands of culpable police defendants in 42 U.S.C. §1983 cases. The text of §1983 makes no mention of immunity, and the common law in 1871 when the predecessor to §1983 was enacted, did not include any freestanding defense for all public officials. With limited exceptions, the baseline assumption of the Founding Fathers and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct.

Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification and in need of correction. See *Kisela v. Hughes*, 138 S. Ct. 1148, 1161 (2018) (Sotomayor, J., dissenting) (the Court's "one-sided approach to qualified immunity" has "transform[ed] the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In an appropriate case, we should reconsider our qualified immunity jurisprudence."); *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("[O]ur treatment of qualified immunity under 42 USC § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume."); *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy,

J., concurring) ("In the context of qualified immunity . . . we have diverged to a substantial degree from the historical standards."). See also, William Baude, Is Qualified Immunity Unlawful? 106 CALIF. L. REV. 45 (2018); Lynn Adelman, The Supreme Court's Quiet Assault on Civil Rights, DISSENT (Fall 2017) (essay by U.S. District Court judge Lynn Adelman); Jon O. Newman, Opinion, Here's a Better Way to Punish the Police: Sue Them for Money, WASH. POST (June 23, 2016), https://perma.cc/9R6N-323Z (article by senior judge on the U.S. Court of Appeals for the Second Circuit); The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, Michigan Law Review, Volume 113 | Issue 7 (2015), (article by former Ninth Circuit Judge Stephen Reinhart).

That being said, in this case, since there is a dispute of material facts as to whether it was objectively unreasonable for Defendants Romanski and Storce to fear imminent and great bodily harm to themselves or others, they are not entitled to qualified immunity. Defendants concede this is the clearly established standard that governs Fourth Amendment excessive force claims. Dkt. 111, p. 5, citing *Graham v. Connor,* 490 U.S. 386, 396 (1989), but erroneously rely on *Kisela v. Hughes,* 138 S. Ct. 1148 (2018) and *Horton v. Probjecky,* 883 F. 3d 941 (7th Cir. 2018) to claim that Defendants Romanski and Storce are protected by qualified immunity. In *Kisela,* the Court found that it was not obvious that a competent officer would have known shooting one individual to protect another would violate the Fourth Amendment. *Id.* at 1153. The defendant off duty officer in *Horton* personally interrupted an armed robbery being perpetrated by four assailants, one of whom threatened him with a revolver and a melee ensued, resulting in all four of the robbers being shot, the three surviving robbers were convicted of felony murder and the estate of the fourth filed an excessive force civil rights claim. Because the defendant officer was

13

outnumbered and reasonably believed that all of the assailants were armed with firearms, he was afforded qualified immunity.

This is in stark contrast to the instant situation. When both Defendant officers arrived and aggressively approached Michele Robey, she was in the throes of a mental crisis and posed no imminent threat to anyone. She waved the knife only when provoked and startled by the officers and they did not observe her threaten anyone else on the scene. Furthermore, just prior to the shooting, she was not warned that these Defendants intended to shoot her if she did not drop the knife, and she was about ten feet away from the officers. Hence, given the totality of the circumstances, it was clearly established, under *Graham v. Connor* and *Tennessee v. Garner* and the cases cited above, that the Defendants Romanski and Storce's deadly shooting of Michele Robey was objectively unreasonable under the Fourth Amendment. Their assertion of qualified immunity should therefore be rejected by this Court.

## II.     PLAINTIFF'S CLAIMS AGAINST THE CITY MUST BE DECIDED BY A JURY

Plaintiff's policy claims brought pursuant to *Monell* as well as her claims for violation of the Americans with Disabilities Act (ADA) include disputes of fact that must be determined by a jury and not resolved on summary judgment.

### A.     Plaintiff's *Monell* Policy Claims Must be Decided by a Jury

Plaintiff's *Monell* claims are supported by a wealth of evidence, including the findings of two official reports, one of which was commissioned by the City itself, which preceded Michele Robey's deadly shooting, a consent decree agreed to by the City that post-dates the shooting, a report by Plaintiff's expert, testimony from the Defendant officers that describe their actions and omissions, and admissions by the City's own experts and 30(b)(6) witnesses. PLT FACTS ##51-57, 63-69,70-76, 77-80, 86-96. All of this evidence, when viewed in the light most favorable to

the Plaintiff, establishes that the City, through its police department, had a longstanding set of deliberately indifferent policies, practices and customs, particularly as they impacted the CPD's response to persons in the throes of a mental health crisis, that were, separately, or together, a moving force behind the unjustified use of deadly force by the police officer Defendants.

More specifically, the evidence shows that the City, in 2004 - - - 13 years before Michele Robey was slain and in response to a spate of shootings of mentally ill persons, began to pay lip service to remedying the obvious problem by offering Crisis Intervention Team (CIT) training to a tiny fraction of the some 13,500 CPD officers who might come in contact with such distressed persons. PLT FACTS ##77(c), 78 (h), 80, 92-94. This training was only offered to those who volunteered for such training. *Id.* #93. Remarkably, as of February of 2017, only slightly more than 10% of the force had received such training; furthermore neither of the Defendant officers had received any such training. Id ##52, 77(c).

As a result of their lack of training, the Defendant officers made no effort to learn crucial information about Michele Robey, which was readily available to them from witnesses on the scene. PLT FACTS ##84-85.  Rosalinda Rodriguez would have informed them that Ms. Robey was in obvious mental distress, and that an unarmed female civilian in the CVS had been able to ward off her ineffectual attacks with a blunt tipped kitchen knife by use of basic self-defense. Id. ## 9, 10, 12, 82-84.Witness Michelle Smith would have informed them that while inside the CVS, Ms. Robey was exhibiting behavior which Ms. Smith considered to be consistent with someone having a mental health crisis. PLT FACTS #10. Additionally, even though they were not CIT trained, the Defendant officers could have, and should have, called for CIT officers to take charge of the situation, something that adequate training would have required them to do. Id. ##58-59, 62, 89-90.

15

The lack of CIT training also infected the CPD and its OEMC's communications system. At least three separate calls, including one from Ms. Rodriguez, were fielded by the 911 communications system, yet no information was obtained concerning Michele Robey's mental health condition, and no call was made to identify the calls as requiring a CIT response. PLT FACTS ##11, 44-45, 85.

Alongside the City's deliberately indifferent failure to implement its CIT training in a reasonably timely and effective manner was its failure to have mandatory force mitigation and de-escalation training in effect before Ms. Robey's shooting. PLT FACTS ##70-71. Although encountering people with knives or edged weapons was a common and expected occurrence, neither Defendant officer had received any training at all on how to deal with or disarm individuals with such weapons. Id. ##72-75. Appropriate and necessary training was not afforded to the Defendant officers, and would have counseled against approaching her aggressively from behind and to her side while she was peacefully sitting on the bench, and would have advised against them immediately shouting commands. Id. ##78 (f), (g), (h), 87, 91. This training would have also trained them to retreat in order to take more time and call for backup, and for these highly conditioned young officers to use a coordinated non-lethal plan to disarm Ms. Robey, such as utilizing a takedown, batons and/or hand strikes to remove the blunt tipped kitchen knife from her hand. Id. ##86-91. Additionally, it would have trained them to utilize de-escalation tactics such as time and distance. Id. ##90-91. More broadly but equally significant, according to the PATF, the DOJ, and the consent decree, the CPD's training of its officers in the use of deadly force, particularly when those in mental crisis were the targets,    was also unconstitutionally deficient both before and after Michele Robey's fatal shooting. Id. ##77-80.

In  *City of Canton v. Harris*, 489 U.S. 378, 389, (1989) the U.S. Supreme Court, while

reviewing a jury instruction given in a §1983 municipal liability case, defined the contours of an actionable *Monell* failure to train claim: "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." The Court continued:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id* at 390.

Further, "in resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform," and "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id*. at 390-91. Significantly, the court further stated that "the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Id*. at 390 n. 10.

A number of courts have validated failure to train claims in factual circumstances similar to those alleged by the Plaintiff here. In *Russo v. Cincinnati*, 953 F.2d 1036, 1045-1046 (6th Cir. 1992), the court applied *Canton* on a motion for summary judgment to hold that the plaintiff, by tendering an expert's opinion, had tendered sufficient evidence to create a question of fact as to whether the City's police training in the specific area of "the use of force on mentally disturbed persons was constitutionally adequate," and whether that training "falls to the level of 'deliberate indifference' under *City of Canton*." In *Warren v. Lincoln*, 816 F. 2d 1254, 1262-63 (8th Cir 1987), the Court relied on the Chief of Police's testimony during which he admitted that officers

17

were trained to take people into custody and question them on the basis of reasonable suspicion to hold that "at the very least, [this testimony] puts into issue the question of whether the Lincoln police department failed to properly train its officers." *See also Diaz v Salazar*, 924 F. Supp. 1088, 1098-99 (D.N.M. 1996) (the actions of four officers in using improper tactics that led to the unconstitutional use of deadly force, when combined with the opinion of a police practices expert, held to be sufficient under *Canton* to defeat summary judgment on the issue of inadequate training in the specific area of handling "drunken, rude, and potentially violent suspects.").

In *Swofford v. Eslinger*, 686 F. Supp. 2d 1277, 1284-87 (M.D. Fla 2009), the court examined the question of training in light of the *Canton* court's specific highlighting of the importance of adequate training in the field of the use of deadly force. Reviewing the evidentiary record, the court found that the evidence, when viewed in the light most favorable to the plaintiff, demonstrated the failure to provide any meaningful training on when to use deadly force, and that a reasonable jury could conclude that the county's abject failure to provide such training constitutes deliberate indifference to the innocent victims of deadly force." *Swofford*, 686 F. Supp. 2d at 1286-87. *See also Buben*, 2010 U.S. Dist. LEXIS 104853, at *12-18 (denying summary judgment on inadequate training claim where there were no allegations of an ongoing pattern of misconduct and the focus was solely on the incident involving the plaintiff because "disputed issues of fact as to whether the failure to train officers in [the] specific skill needed to handle recurring situations – i.e. skills for interacting with mentally ill persons and skills regarding the use of TASERS on individuals on elevated surfaces, or who are passively resisting – presented an obvious potential for constitutional violations rising to the level of deliberate indifference."); *Spell v. McDaniel*, 824 F. 3d 1380, 1394-95 (4th Cir. 1987) (upholding a verdict

against the municipality that was premised in part on the Department's training, encouraged by the Chief, that sanctioned the use of excessive force (grabbing the testicles and kicking the groin to subdue arrestees).

Turning to notice and deliberate indifference, it is clear from the PATF and DOJ reports that the City was on notice that its implementation of CIT, Force Mitigation training, and its related training in the use of deadly force, had been woefully inadequate for more than a decade before Michele Robey's fatal shooting. It is also clear that the City continued this inadequacy despite known cases of unjustified police shootings of mentally disturbed citizens, including Laquan McDonald and Quintonio LeGrier, and, as demonstrated by the 2018 Consent Decree, this longstanding failure to train was continued by the City even after Ms. Robey's shooting. All this makes out a strong case for a jury regarding notice and deliberate indifference. It is equally compelling that these related failures were a moving force as similarly demonstrated by the actions and inactions of the untrained police Defendants.

It is therefore apparent that Plaintiff's evidence is sufficient to establish, when viewed in the light most favorable, that the City, by and through its Police Department, had woefully inadequate training in the related, specific, and crucial areas that included the use of deadly force when handling citizens suffering from an active mental crisis. It is similarly apparent that these failures establish deliberate indifference by the City that is closely linked as a moving force to the unjustified use of deadly and fatal force against Michele Robey.

The major thrust of the City's argument for summary judgment relies on *City of Los Angeles v. Heller*, 475 U.S. 796 (1986) to assert an erroneous blanket rule that if judgment for the police officer Defendants on the federal claims is granted, so too must it be granted to the City on Plaintiff's *Monell* claim. Contrary to this contention, numerous courts since *Heller* was

19

decided more than thirty years ago have identified several situations where municipal liability can be found without individual liability. See: *Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010) (" the jury could have found that the CMT defendants were not deliberately indifferent to Smith's medical needs, but simply could not respond adequately because of the well-documented breakdowns in the County's policies for retrieving medical request forms. It is not difficult to reconcile the verdicts in this instance, and we see nothing amiss in holding the County liable even though none of the CMTs were individually responsible."); *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992) (city could be liable for improper training and procedure even if the officer was found not liable for excessive use of force); *Rivas v. Freeman*, 940 F.2d 1491 (11th Cir. 1991) (county held liable for lack of policies, procedures, and training, but arresting officers were merely negligent and their acts flowed from the lack of policies); *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985) (A municipality's failure to provide adequate jail funding or staffing may cause a constitutional violation even if the individual staff members involved are doing the best they can in a bad situation.); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) (failure to provide substitute nurse when jail nurse was absent could support municipal liability); *Fairley v. Luman*, 281 F.3d 913, 916–18 (9th Cir. 2002) (improper arrest and detention resulted from "the collective inaction of the Long Beach Police Department"); See also, *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985). (A municipality may be liable where the plaintiff's injury results from improper police training or procedure even if the individual officer is exonerated.); *Estate of Wells v. Bureau County,* 723 F. Supp. 2d 1061, 1084-1085 (C.D. Ill. 2010).

The recognized exception to *Heller* is also applicable where the individual defendants are afforded qualified immunity, leaving the municipality as the only non-immune defendant. See,

*Owen v. City of Independence*, 445 U.S. 622, 652, 100 S.Ct. 1398 (1980) (a "'systemic' injury" may "result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith.") (citation omitted); *Chew v. Gates*, 27 F.3d 1432, 1438-39 (9th Cir.1994); *Barrett v. Orange County Human Rights Co*m'n, 194 F.3d 341, 350 (2nd Cir. 1999) ("[U]nder *Monell*, municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants."); *Newcomb v. City of Troy*, 719 F.Supp. 1408, 1416-17 (E.D. Mich. 1989); cf. *Wilson v. Town of Mendon*, 294 F.3d 1, 7 (1st Cir. 2002) (A plaintiff may fail to name the correct individual defendants, or any individual defendants, but could still recover against the municipality if injured by a municipal policy.)

Thus, for the forgoing reasons, it is clear that the Plaintiff's evidence requires her *Monell* claims to be decided by a jury, regardless of whether or not the individual Defendants are granted summary judgment.

### B.    Plaintiff's ADA Claims Must be Decided by a Jury

Defendant City moves for summary judgment on Plaintiff's claim against the City of Chicago brought under Title II of the Americans with Disabilities Act (ADA). Summary judgment should be denied because a review of the record, in the light most favorable to Plaintiff, shows that the evidence is such that a reasonable jury could return a verdict for the Plaintiff on this claim. To show a violation of the ADA, the plaintiff must prove that she is a "qualified individual with a disability," that she was denied "the benefits of the services, programs, or activities of a public entity" or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was "by reason of" their disability. 42 U.S.C. §

12132; *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). In reviewing the undisputed facts in the light most favorable to Plaintiff, and drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could find that Plaintiff meets these elements and consequently return a verdict in Plaintiff's favor under the ADA.

Here, it is undisputed that Ms. Robey was a qualified individual with a disability. As Plaintiff's expert Timothy Longo states in his report, Ms. Robey was clearly a "qualified individual with a disability" as evidenced by medical records from her most recent psychiatric hospitalization. PLT FACTS #5. In its motion for summary judgment, the City does not challenge this conclusion and makes no argument that Ms. Robey was not a qualified individual.[2]

A Title II claim under the ADA can be established by showing that "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006). Here, a reasonable jury could find that Defendant City violated the ADA under all three frameworks.

A jury could find under the first approach that Defendant City intentionally discriminated against Michele Robey. In the Seventh Circuit, a plaintiff can establish intentional discrimination in a Title II damage action by showing deliberate indifference. *Lacy v. Cook Cnty.*, 897 F.3d 847, 862-63 (7th Cir. 2018). The Court has adopted a two part standard to show deliberate indifference in this context, requiring "(1) 'knowledge that a harm to a federally protected right

_____

[2] Pursuant to FRCP 26(a)(2), Plaintiff disclosed numerous medical treaters who would testify that Ms. Robey was treated for psychological issues which would establish that she was a "qualified individual." Defendants have declined to depose any of these treaters, indicating that they do not dispute that Ms. Robey was a qualified individual under the ADA. Further, the City has waived the argument that Ms. Robey was not a qualified individual by not raising it prior to its Reply Brief. "It is well settled that issues raised for the first time in a reply brief are deemed waived." *Nelson v. La Crosse Cnty. Dist. Atty. (In re Nelson)*, 301 F.3d 820, 836 (7th Cir. 2002).

is substantially likely' and (2) 'a failure to act upon that likelihood.'" *Id.* (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). Here, the City was on notice that its policies, practices and customs of responding to individuals with mental health disabilities would be likely to violate the rights of those individuals. The DOJ found in its report that there were unreasonable and repeated uses of force against individuals in mental health crisis, finding that CPD officers use force against people in mental health crisis where force could have been avoided and that CPD officers' use of unconstitutional force had historically been tolerated by CPD. PLT FACTS #78(c), 78(g). Further, the City failed to adequately act on the likelihood that its policies and practices would violate the rights of individuals with mental health disabilities. As Plaintiff's expert Timothy Longo stated, "When policy makers fail to train and equip those who will most likely be the first to confront a crisis situation, the results are both foreseeable and tragic." PLT FACTS #95.

Alternatively, a jury could find for Plaintiff under the second method, in that the City refused to provide a reasonable modification. A plaintiff can "demonstrate discrimination on the basis of a disability by a defendant's refusal to make a reasonable accommodation." *Washington v. Ind. High Sch. Ath. Ass'n*, 181 F.3d 840, 848 (7th Cir. 1999). Here, the City failed to provide reasonable accommodations in that its policies and practices fail to adequately address and account for responding to individuals in mental health crisis.

The City of Chicago created a Crisis Intervention Team (CIT) in 2005, following a series of highly publicized shootings of persons with mental illness. PLT FACTS #77(c). However, the CIT unit and the City's training, policies, and practices regarding when that unit was to be dispatched is insufficient because it fails to provide a reasonable modification to individuals suffering a mental health crisis. More than a decade later, only 1300-1400 officers have

23

completed the training, which is slightly more than 10% of CPD's force, meaning that nearly 90% of officers have not been trained. PLT FACTS ##52, 92.

The City's policies and procedures regarding CIT are further shown to be deficient by its failure to provide sufficient training to the City's Office of Emergency Management Center (OEMC) employees. OEMC is the City agency responsible for receiving emergency calls and identifying whether a CIT unit should be dispatched. According to the PATF Report, OEMC suffers from recurring problems with its approach to determining whether calls involve a mental health crisis. PLT FACTS #77(d). Similarly, the DOJ report found that OEMC dispatchers did not recognize calls as involving someone in crisis and did not ask questions that may have resulted in clues that it did. PLT FACTS #78(i).

When an OEMC call-taker receives a call, an "event" is created. An unduly limited number of event categories are automatically identified as potentially related to mental health situations, including "mental health disturbance," attempting suicide" and "threatening suicide." PL FACTS #63. Only then is a "CIT" button depressed, which prompts the call-taker to ask a list of five "triage questions." Those questions are: 1) Are there weapons present? 2) Does a mental illness exist? 3) is the person under a doctor's care? 4) Is she or he taking medication? 5) Is the person violent or does he or she have violent tendencies?" PLT FACTS #64. If the answer to "does a mental illness exist" is "yes," then a list of questions is added to the triage, inquiring about specific diagnoses. *Id.* Based on the answers to those "triage questions," the call-taker is trained to assess whether the call is CIT related.

OEMC call-takers are informed that they have discretion to depress the button for other event types. PLT FACTS #63. However, call-takers are not trained as to specific types of behavior that should prompt the triage questions and are not trained to ask any additional

questions to obtain information about whether someone is in a mental health crisis. PLT FACTS #65. For example, call-takers are not trained to ask follow up questions when they think the subject might be having difficulty distinguishing reality from fantasy. *Id.* According to the PATF report, OEMC personnel find it to be challenging to effectively probe callers in order to determine whether mental health may be at issue. PLT FACTS #77(e). As a result, the PATF recommended that OEMC should implement more training regarding mental health awareness. PLT FACTS #77(g), #77(h).

Once a call-taker creates an event, it is passed to a dispatcher, whose main function is to communicate with officers on the radio who are in the field. PLT FACTS #68, #78(i). Dispatchers are trained to provide the information in the event to responding officers. PLT FACTS #62. If a dispatcher has information that a mental health issue is related to the call, it is protocol to assign a CIT officer. *Id.* However, dispatchers are not trained to elicit additional information from call-takers to identify whether someone may be in a mental health crisis. Also, beat officers are not trained to inquire of dispatch whether there is a mental health issue related to the call. *Id.*

As part of their training on identifying individuals in mental health crisis, OEMC employees are required to attend an eight hour "mental health crisis awareness" training. PLT FACTS #67. However, CIT trained officers do not attend the OEMC "mental health awareness" training. PLT FACTS #68. Similarly, OEMC employees are not required to attend the CIT training provided to CPD officers who wish to become CIT certified. *Id.* As a result, the individuals trained to identify and dispatch CIT officers do not receive training or necessary information about the training, skills, and services which CIT units provide to individuals in

25

mental health crisis. They are therefore less likely to know which situations warrant a CIT trained officer.

The City's policy and practice creates a critical deficiency, wherein calls potentially related to mental health issues are not identified as such. Further, there is no process or policy in place, as far as the City's 30(b)(6) witness is aware, for OEMC to review mental health-related incidents to assess potential improvement or to ensure that calls are being effectively identified as being mental health related. PLT FACTS #69. As the PATF stated, "OEMC suffers from recurring problems with its approach to determining whether calls involve a mental health crisis, including inadequate protocols, limited training, lack of data and other support, and gaps in communication with CPD." PLT FACTS #77(d).

A jury could also find that Defendant City's policies in relation to CIT had a disproportionate or disparate impact on people with disabilities. Such a claim usually relies on statistical analysis. "The evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 753 n.14 (7th Cir. 2006) (Quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987 (1988)). Here, the City's deficiencies in regard to identifying individuals in mental health crisis makes it impossible to properly apply a statistical analysis. According to Plaintiff's expert Timothy Longo, "OEMC is falling short on properly capturing and analyzing data related to mental health calls for service" and CPD is "missing the opportunity to use data to shape policy, practice, training and response." PLT FACTS #96. As the PATF found, OEMC data systems do not sufficiently collect data. PLT FACTs #77(d), #77(f). OEMC also does not review mental health-related calls to identify potential improvements. PLT FACTS #69. Based on these facts, and the finding in the DOJ report that

officers use force against people in mental health crisis where avoidable, a reasonable inference can be drawn that CPD's policies have a disparate impact on people with disabilities. PLT FACTS #78(c).

Rather than addressing the deficiencies of OEMC and the CIT program, the City argues that Plaintiff's ADA claim is defeated by "exigent circumstances." Dkt. 111, p. 21, ln. 21. To support its argument, the City relies heavily on *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000). In that case, the Fifth Circuit stated that "life-threatening situations" created "exigent circumstances" in which the ADA did not apply. *Id.* at 801. This unwritten "exigent circumstances" exception does not appear in the statutory language of the ADA and other Circuits have declined to follow the Fifth Circuit's unwritten exception.

The Seventh Circuit has not addressed the issue of whether "exigent circumstances" preclude an ADA claim, but other courts in this district have declined to follow *Hainze.* In *Earl v. Espejo*, 2017 U.S. Dist. LEXIS 137398 (N.D. Ill. Aug. 28, 2017) (Feinerman, J.), plaintiff Earl was suffering from a mental health crisis and attempted to take a bus to the hospital. *Id.* at *3. The bus driver sought assistance from CPD officers and informed them that Earl was "causing a disturbance." *Id.* The plaintiff was displaying "obvious and severe signs of mental illness" and the officers responded with force. *Id.* at *3.  Based on his encounter with the CPD officers, the plaintiff brought a claim under the ADA. *Id.* at *2. The City moved to dismiss the ADA claim in that case, which the court denied, relying on authority that the ADA accommodation requirement applies during arrests. *Id.* at *7.

In *Spencer v. Dawson,* 2006 U.S. Dist. LEXIS 81743 (N.D. Ill. Nov. 7, 2006), the court disregarded the Village of Wheeling's argument that the ADA did not apply to "on-the-street responses to reported disturbances." *Id.* at *32. Similar to this case, *Spencer* involved defendant

police officers responding to a 911 call where an individual was upset, angry and agitated. *Id.* at *11, 32. The court in *Spencer*, in properly applying the summary judgment standard and "viewing the record from Spencer's perspective," held that "there was no exigent threat to the officers or third parties." *Id.* at 32. Similarly, here, in viewing the record in the light most favorable to the Plaintiff, there are no exigent circumstances that require summary judgment.

Notably, in *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018), the 9th Circuit reversed the district court's ruling on an ADA claim in a fatal police shooting. In *Vos*, police responded to a 911 call about a man, Gerritt Vos, behaving erratically and brandishing a pair of scissors in a 7-Eleven. *Id.* at 1028. The man was agitated, cursing at people, and at one point, grabbed a 7-Eleven employee and yelled "I've got a hostage!" *Id.*, at 1028-1029. After police arrived at the scene, the clerks informed them that the man had armed himself with scissors and cut an employee, causing a "half-inch laceration." *Id.* After police arrived, Vos yelled statements, including "shoot me." *Id.* at 1029. Vos ran toward the officers holding an object, which the officers believed to be scissors. *Id.* Officers shouted for Vos "to drop the weapon" and when Vos did not comply, two officers fired their weapons at Vos, fatally shooting him. *Id.* at 1030. His medical history revealed that he had been diagnosed as schizophrenic. *Id.* Vos' parents brought a lawsuit, alleging that the fatal shooting violated the ADA Vos. *Id.* at 1036. The District Court granted summary judgment to the Defendants. The Ninth Circuit reversed, finding that the officers had "the time and the opportunity to assess the situation and potentially employ the accommodations identified by the Parents, including de-escalation, communication, or specialized help." *Id.* at 1037.

Similarly, Defendant Officers Romanski and Storce had the time and opportunity to assess the situation and potentially employ reasonable accommodations. According to Plaintiff's

expert Timothy Longo, "there were multiple opportunities to slow the situation down and call for the assistance of CIT trained personnel. PLT FACTS #90. When the Defendant Officers arrived at the CVS parking lot, there was no discussion with the witnesses as to what happened inside the CVS or the condition of the woman who had been inside the CVS, most particularly that her words, actions and clothing clearly indicated that she was in a mental crisis. PLT FACTS ##10, 85. When Defendant Officers aggressively approached Ms. Robey from the back and side, she was sitting, with the knife in her hand, but not pointing it at either officer. PLT FACTS #16. Neither Defendant radioed for CIT officers to come to the scene and did not wait for backup to arrive. PLT FACTS #44, #45. As Timothy Longo opined, "quickly advancing on Ms. Robey, placing her at gun-point, and giving her strong verbal commands had the foreseeable effect of escalating her behavior and creating a deadly force scenario that may have been avoided had the defendant officers called upon properly trained CIT officers, maintained a safe distance, used appropriate de-escalation techniques and more thoughtfully considered how their actions may place them, Ms. Robey, and innocent by-standers at risk of harm. PLT FACTS #91. Like in *Vos*, Defendants Storce and Romanski could have employed the de-escalation tactics that are trained to CIT officers. PLT FACTS #55. However, they failed to do so, and as a result, a jury could find that the City failed to provide a reasonable accommodation to a qualified individual, in violation of the ADA.

## III.  PLAINTIFF'S STATE LAW CLAIMS MUST BE DECIDED BY A JURY

Plaintiff also brings claims for the wrongful death of Ms. Robey, a survival action, and for funeral expenses pursuant to Illinois law. Additional state law claims include battery, intentional infliction of emotional distress and conspiracy against the individual Defendant officers. Should this court rule against Plaintiff on its federal claims, the court may relinquish

supplemental jurisdiction over the state law claims. *Estate of Hollstein v. City of Zion,* 2019 WL 1619976 (Apr. 16, 2019, N.D. Ill.). As this court noted in *Estate of Hollstein,* it is similarly true in the instant case that judicial resources will be conserved as the parties have spent considerable time on discovery and the fruits of those labors will be applicable to any litigation in state court.

A.     **The Fatal Shooting of Michele Robey Constituted a Wrongful Death, Battery, Intentional Infliction of Emotional Distress, and Conspiracy**

The Illinois Wrongful Death Act provides a cause of action, "[w]henever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof." 740 ILCS 180/1 (2019); *Williams v. Manchester*, 228 Ill.2d 404, 320 Ill. Dec. 784, 888 N.E.2d 1, 10 (2008) ("An injury resulting from the wrongful act, neglect, or default of another gives the victim, if she survives the injury, a right of action; if the victim dies, the [Wrongful Death] Act transfers the right of action to the victim's personal representative"). Damages are also available under the Survival Act [755 ILCS 5/27-6 (2019)] for the personal injuries Michele Robey suffered before she died and for funeral expenses necessitated by her death. See, e.g., *Murphy v. Martin Oil Co.*, 56 Ill.2d 423, 308 N.E.2d 583, 586-587 (1974).

There is no dispute that Defendants caused Ms. Robey's death and therefore are responsible for the resulting damages. Although Michele Robey immediately fell to the ground after being shot by Defendant Romanski, she did not appear to be dead and was groaning in pain. PLT FACTS #41. Funeral expenses were shown by documents produced in discovery as well as testimony from family members.

Defendant Romanski committed a battery by intentionally causing a harmful or offensive touching by fatally shooting Michele Robey. See, e.g. *Bakes v. St. Alexius Med. Ctr.,* 955 N.E.2d

78 (1st Dist. 2011). Both Defendant Officers intentionally inflicted emotional distress on Michele Robey by unjustifiably shooting at her. This was intentional, extreme, and outrageous conduct that did in fact cause severe emotional distress. *Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498 (1994). In determining whether conduct is extreme and outrageous, the degree of power or authority a defendant has over a plaintiff must be considered and can be shown by an abuse of a position of power. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1 (1992); *McGrath v. Fahey*, 126 Ill. 2d 78, 90 (1988). Whether a defendant's conduct has resulted in severe emotional disturbance is a question of fact for a jury. *Knierim v. Izzo,* 22 Ill.2d 73 (1961); *Corgan v. Muehling,* 143 Ill.2d 296 (1991).

A civil conspiracy claim under Illinois law may be established by (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston,* 209 Ill.2d 302, 317, 807 N.E.2d 461, 470, 282 Ill. Dec. 837 (Ill. 2004). The nature of a conspiracy often does not allow for direct proof and a meeting of the minds may be inferred from the surrounding circumstances. *Hampton v. Hanrahan*, 600 F.2d 600, 620 (7th Cir. 1979); *Adickes v. Kress & Co.*, 393 U.S. 144, 158-59 (1970). *See also Jones v. City of Chicago*, 856 F.2d 985, 990 (7th Cir. 1988) ("To be liable as a conspirator you must be a voluntary participant in a common scheme, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree either explicitly or implicitly, to do your part to further them"). Both Defendant officers approached Ms. Robey with guns drawn, acted together throughout the thirty-seven second encounter in following her, failing to contain her, and creating the conditions to

31

both discharge their weapons at her. A jury should determine whether they are liable under state law for the tort of conspiracy.

**B.      Defendants are not Protected by Immunity as a Jury Must Determine Whether their Conduct was Willful and Wanton**

Willful and wanton conduct does not enjoy immunity pursuant to the Illinois Tort Immunity Act. 745 ILCS 10/1-101, *et seq.* It is a question of fact that must be determined by a jury whether any conduct was willful and wanton. Furthermore, qualified immunity from a §1983 claim does not provide a shield against Illinois state law claims. *Horton v. City of Chicago,* 2018 U.S. Dist. LEXIS 168878 (N.D. Ill., Sept. 30, 2018). The defendant officer in *Horton* fatally shot the plaintiff decedent when he was reaching for the officer's gun; nonetheless the Court found that even if a defendant is entitled to qualified immunity on his federal claims, the issue of immunity for the state law claims is a question of fact to be resolved by a jury based on the circumstances of the case. Similarly, in *Alto v. City of Chicago,* 863 F. Supp. 658 (N.D. Ill. Aug. 29, 1994).*,* the Chicago police defendant who fatally shot the plaintiff decedent who brandished a knife and physically struggled with police was denied summary judgment on the state law claims because a jury could find that the officer acted with "utter indifference" or "conscious disregard," even though summary judgment was granted on the federal claims. *Alto,* 863 F. Supp. at 664.

Furthermore, under Illinois law, a jury could find a defendant liable for willful and wanton conduct in the absence of a finding of a §1983 federal civil rights violation. *Poole v. City of Rolling Meadows,* 167 Ill. 2d 41, 50 (Ill. 1995) (willful and wanton misconduct may be either intentional or merely reckless); *Medina v. Chicago,* 238 Ill. App. 3d 385, 396 (1st Dist. Nov. 18, 1992) ("There is no inconsistency between the Federal claim and State claim verdicts. Two different standards are involved.").

This result was affirmatively articulated in *Price v. City of Chicago,* 2018 IL App.161599 (2018). In *Price,* the Illinois Appellate Court reinstated a jury verdict for $3.5 million in a wrongful death action against a Chicago police officer for a fatal shooting. The trial judge had entered a judgment of no liability in favor of the defendants because the jury answered two special interrogatories, both in the affirmative. The first asked whether the officer reasonably believed the decedent's actions placed him or his fellow officer in imminent threat of death or serious bodily harm. The second asked if the officer's shooting of the decedent was willful and wanton. So, although the jury thought the officer reasonably believed he or another was imminently threatened with death or serious harm, his conduct was nonetheless also willful and wanton. The appellate court held that the affirmative answer to the first interrogatory left open the question of whether the officer's decision to use deadly force was reasonably necessary under the circumstances.

> A reasonable hypothesis exists that despite Officer Proano's reasonable belief that he and his fellow officers were under imminent threat of death or great bodily harm, the jury may have determined that his decision to use deadly force was not reasonably necessary to prevent the threat he faced.

*Price*. 2018 IL App. at *P41.

So too, here, even if a state jury found that Defendants Romanski or Storce reasonably believed they were in imminent threat of death or great bodily harm, their conduct may well also be deemed willful and wanton as required for a state claim of wrongful death to prevail. Ms. Robey was in the throes of an extreme mental health crisis, she was an older woman of slight build, laden with multiple layers of clothing, carrying a coffee cup in one hand and waving a broken tipped kitchen knife in the other. The physically fit, fully equipped and uniformed Defendant police officers fired upon her within thirty-seven seconds even though they had time

to make a radio call, create some distance if they chose to, and made no attempt to calm Ms.

Robey down. A state jury could therefore reasonably find willful and wanton conduct here.

## CONCLUSION

Defendants' motion must be denied in its entirety, or in the alternative, should this court

dismiss all of Plaintiff's federal claims then jurisdiction over the state law claims should be

relinquished to be pursued in state court.

<u>/s/ Janine L. Hoft</u>
One of Plaintiff's Attorneys


Dated:  November 22, 2019


Janine L. Hoft
G. Flint Taylor
Brad J. Thomson
PEOPLE'S LAW OFFICE
1180 North Milwaukee Avenue
Chicago, IL  60642
(773) 235-0070

Attorneys for Plaintiff

34

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ESTATE OF MICHELE ROBEY,** | ) | |
| **Deceased, by Anastasia Robey, Administrator,** | ) | |
| | ) | **No. 17 CV 2378** |
| **Plaintiff,** | ) | |
| | ) | **Honorable Edmond E. Chang** |
| | ) | |
| **vs.** | ) | **Jury Demand** |
| | ) | |
| **CITY OF CHICAGO, Chicago Police Officers** | ) | |
| **STEPHEN ROMANSKI, Star #18685; and,** | ) | |
| **ANGELA STORCE, Star #9761;** | ) | |
| | ) | |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

I, Janine Hoft, certify that on November 22, 2019, I electronically filed Plaintiff's Memorandum of Law in Response to Defendants' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Jennifer K. Bagby
Maria E. Magginas
Michele McGee
City of Chicago Department of Law

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Elizabeth A. Ekl
Katherine C. Morrison
Reiter Burns LLP

/s/ Janine L. Hoft
Janine L. Hoft

One of Plaintiff's Attorneys

35